(251 P.3d 651)
No. 104,727

IN THE MATTER OF THE APPLICATION TO ADOPT I.H.H.-L., MINOR CHILD. IN THE MATTER OF THE GUARDIANSHIP AND CONSERVATORSHIP OF I.H.H.-L., MINOR CHILD.

Opinion filed April 8, 2011.

*Timothy A. Short*, of Law Office of Timothy A. Short, of Pittsburg, for appellant natural father.

*Sara S. Beezley*, of Beezley Law, L.L.C., of Girard, for appellees adoptive parents.

Before GREENE, C.J., PIERRON and ARNOLD-BURGER, JJ.

GREENE, C.J.: The natural father of I.H.H.-L., his 2-year-old infant daughter, appeals the district court's termination of his parental rights, arguing error in the admission of statements made by the infant's deceased mother and challenging the sufficiency of the evidence to support the judgment. Because we conclude the district court was without jurisdiction in the adoption case and associated proceedings to terminate Father's parental rights, we vacate the judgment and remand with directions.

## FACTUAL AND PROCEDURAL BACKGROUND

Natural father began dating natural mother in the spring of 2008 while they both lived in New Hampshire. Mother became pregnant in the summer of that year, and the couple began living together. Their relationship was apparently rather turbulent, and mother moved out in late September 2008. Within 6 months, she moved to Kansas to live with her brother, J.W.C., and his wife, J.R.C. On March 27, 2009, Mother gave birth to I.H.H.-L. The birth certificate did not name the natural father, but the child was named with

a hyphenated combination of the last name of her natural parents. Shortly after the birth, Mother took the infant to New Hampshire but returned to Kansas within a few weeks.

On July 21, 2009, Mother committed suicide. The following night, Father sent J.W.C. a text message expressing his condolences, and the next day, Father telephoned J.W.C. to arrange to pick up I.H.H.-L from J.W.C. and J.R.C. They refused to make arrangements to transfer I.H.H.-L to Father, and J.W.C. told Father that because there had been no paternity test, he did not consider Father to be I.H.H.-L.'s father. Subsequently, Father retained an attorney.

On July 23, 2009, J.W.C. and J.R.C. filed a petition for appointment of co-guardians and co-conservators of I.H.H.-L., asserting that paternity had not been established. The district court appointed J.W.C. and J.R.C. temporary co-guardians and co-conservators of I.H.H.-L. for a period to expire in 30 days. On August 11, 2009, Father filed his answer to the petition for the appointment of co-guardians and co-conservators, and on August 25, 2009, he filed a motion to set aside the appointment of J.W.C. and J.R.C. as temporary co-guardians and co-conservators of I.H.H.-L.

On October 2, 2009, J.W.C. and J.R.C. filed a petition for adoption, alleging that they were temporary guardians and consenting to their adoption of the child. As a part of this petition, they also sought termination of the father's parental rights under K.S.A. 59-2136, thus precluding the necessity of his consent to their adoption. On October 8, 2009, the district court issued a temporary order placing the infant in the care and custody of J.W.C. and J.R.C. and appointing a social worker to complete a home study.

In late October and early November 2009, Father and the infant gave samples for DNA testing, which showed the probability of Father's paternity at 99.99%. These results were submitted to the district court as a part of the guardianship case on November 20, 2009. J.W.C. and J.R.C. never contested Father's paternity thereafter, and in a memorandum they filed with the court in late November, 2009, they stated that "pursuant to K.S.A Chapter 38-1114, no presumption of paternity existed until the genetic test results were received."

On December 31, 2009, the district court consolidated the guardianship case and the adoption case. A 2-day hearing on the termination of father's parental rights commenced on January 28, 2010. On July 15, 2010, the district court issued its memorandum decision in the consolidated cases, concluding that Father's paternity had been established by DNA testing, but terminating his parental rights based upon a general lack of support and minimal visitation of the child. The memorandum decision also found that the best interests of the child would be achieved by the adoption of her by J.W.C. and J.R.C.

Father timely appeals the termination of his parental rights.

## DID THE DISTRICT COURT HAVE JURISDICTION OVER THE ADOPTION PROCEEDINGS AND ASSOCIATED PROCEEDINGS TO TERMINATE FATHER'S PARENTAL RIGHTS?

Neither party questioned the district court's jurisdiction to conduct the proceedings that led to this appeal. On its own motion, however, this court questioned that jurisdiction and sought additional briefing from the parties addressing the jurisdictional questions. An appellate court has a duty to question jurisdiction on its own initiative. See *State v. Gill*, 287 Kan. 289, 294, 196 P.3d 369 (2008). "Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. [Citation omitted.]" *Shipe v. Public Wholesale Water Supply Dist. No. 25*, 289 Kan. 160, 165, 210 P.3d 105 (2009).

There does not appear to be any reason to question the jurisdiction of the district court over the guardianship proceedings. On July 23, 2009, the district court appointed J.W.C. and J.R.C. temporary co-guardians and co-conservators for I.H.H.-L. The order stated:

"The appointment and authority of the temporary co-guardian and co-conservator shall expire upon the appointment and issuance of letters to a co-guardian and co-conservator for the proposed ward and conservatee or the determination that the petition filed for appointment of . . . co-guardians and co-conservators should be denied but *in no event shall the authority continue beyond thirty (30) days after the issuance of this order unless the authority is extended by the issuance of successive orders as provided by K.S.A. 59-3037(b)(3)*." (Emphasis added.)

The record on appeal does not contain any successive orders extending the appointment, and neither party makes reference to any such extension. Thus, at the latest, J.W.C. and J.R.C's authority as temporary co-guardians expired on August 22, 2009, some 5 weeks prior to the filing of their petition for adoption, which was filed on October 2, 2009. This petition contained the request to terminate Father's parental rights and the consent to the proposed adoption.

*Lack of Standing to Seek Adoption or Termination of Father's Parental Rights*

We must examine carefully whether the potential adoptive parents had any authority to initiate the termination proceedings as of October 2, 2009. At oral argument, counsel for adoptive parents argued that they had custody of the child and the request to terminate parental rights was proper under K.S.A. 2010 Supp. 59-2136(e), which provides:

"Except [in a stepparent adoption], if a mother desires to relinquish or consents to the adoption of such mother's child, a petition shall be filed in the district court to terminate the parental rights of the father, unless the father's relationship to the child has been previously terminated or determined not to exist by a court. *The petition may be filed by the mother, the petitioner for adoption, the person or agency having custody of the child or the agency to which the child has been or is to be relinquished.*" (Emphasis added.)

J.W.C. and J.R.C. argue that, because they had *physical* custody of I.H.H.-L. at the time they filed the petition for adoption, the fact that they did not have *legal* custody is irrelevant. Initially, it should be noted that "custody" is not defined for purposes of the Kansas Adoption and Relinquishment Act, under which J.W.C. and J.R.C. requested termination of Father's parental rights. See K.S.A. 59-2112. "An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings." *Padron v. Lopez*, 289 Kan. 1089, 1097, 220 P.3d 345 (2009). "Custody" is commonly understood to encompass both physical and legal custody. Black's Law Dictionary 412 (Deluxe 8th ed. 2004) defines "custody" in the family law context as "[t]he care, control and maintenance of a child

awarded by a court to a responsible adult. Custody involves legal custody (decision making authority) and physical custody (caregiving authority), and an award of custody [usually] grants both rights." Based on this definition, it is doubtful the legislature intended to enable anyone with mere physical custody of a child to file a petition requesting termination of a natural parent's rights.

Moreover, we believe such broad authority from mere physical custody poses further problems. The termination of parental rights in Kansas is a serious and permanent legal step that severs natural parental bonds forever; the notion that such proceedings could be initiated by anyone with mere physical custody of a child is a stretch we can neither embrace nor square with legislative intent given the historical protection afforded natural parents in Kansas. See, *e.g.*, *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430, 242 P.3d 1168 (2010) (discussing "Kansas' public policy that the best interests of children are served by fostering their relationships with their natural parents in cases where parents have assumed parental duties toward their children. [Citation omitted.]"); *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010) (interpreting applicable statutory provisions consistently with "Kansas' historical adherence to the parental preference doctrine"); *In re Adoption of Smith*, 6 Kan. App. 2d 575, 631 P.2d 255 (1981) (denying potential adoptive parents' petition to adopt where mother had not consented to adoption, even though potential adoptive parents had physical custody of the child).

Further, at the time J.W.C. and J.R.C. requested termination of Father's parental rights, as the people "having custody of the child," they did not have physical custody of I.H.H.-L. pursuant to any legal order contained in the record on appeal. The emergency order appointing J.W.C. and J.R.C. as temporary co-guardians and co-conservators did not specifically grant the custody and control of I.H.H.-L. to J.W.C. and J.R.C. The letters of temporary co-guardianship and co-conservatorship issued to J.W.C. and J.R.C. assigned them "all the powers and duties of guardians" and conservators, but it is less than clear that such general grant should be interpreted more broadly than the order appointing J.W.C. and J.R.C. temporary co-guardians and co-conservators. Research has

not provided a controlling rule on which document controls between a conflicting order appointing a guardian and a letter of guardianship. Regardless, J.W.C. and J.R.C.'s legal grant of custody of I.H.H.-L. that stemmed from their appointment as temporary co-guardians and co-conservators ended, at the latest, on August 22, 2009, 30 days after the order of appointment. See K.S.A. 2010 Supp. 59-3073(b)(3).

The only other order in the record on appeal that granted custody of any sort to J.W.C. and J.R.C. was a temporary order entered on October 8, 2009, *after* the adoption was filed in which the district court found that I.H.H.-L. was in the care and custody or J.W.C. and J.R.C. and "shall remain in the care and custody of the adoptive parents." The request for termination of Father's rights under K.S.A. 2010 Supp. 59-2136(h) was made in the petition for adoption, which was filed October 2, 2009. Therefore, at the time J.W.C. and J.R.C. requested that the district court terminate Father's parental rights under K.S.A. 2010 Supp. 59-2136(e), they did not have a valid, enforceable legal decree granting them custody of any sort of I.H.H.-L.

We do not believe that a jurisdictional or standing defect that exists at the time of filing may be later cured by a change in a party's circumstances. In an unpublished opinion, this court has previously addressed an analogous issue: whether a party who fails to plead with the level of specificity statutorily required to convey jurisdiction may later amend the original petition to satisfy the statutory requirement. *Siebert v. Kansas Dept. of Revenue*, No. 99,066, unpublished opinion filed November 7, 2008, slip op. at 2-3, *rev. denied* 289 Kan. 1280 (2009). This court held that by submitting a pleading that does not comply with the statutory requirement,

"a party has not merely failed to show the court has jurisdiction but has rather, by that very action, deprived the court of jurisdiction over the action. Because '[p]leadings may not be amended in a court having no jurisdiction,' [citation omitted], a petitioner in this situation may not then attempt to correct this jurisdictional defect by seeking to amend the petition." *Siebert*, slip op. at 11.

Here, J.W.C. and J.R.C. could not have amended their petition to correct the jurisdictional defect since the jurisdictional defect was not due to insufficiency of pleading. Rather, the jurisdictional

defect was the result of their status at the time of filing the petition: they were not statutorily authorized to request termination of Father's rights. See K.S.A. 2010 Supp. 59-2136(e). Therefore, there was no valid action that later could be "cured" by J.W.C. and J.R.C. obtaining a valid order granting them custody.

Finally, we note the federal rule that the determination of jurisdiction and standing should rest on the facts in existence at the time of filing. See *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 580, 124 S. Ct. 1920, 158 L. Ed. 2d 866 (2004) ("The time-of-filing rule is what it is precisely because the facts determining jurisdiction are subject to change, and because constant litigation in response to that change would be wasteful."). Following the argument that a subsequent appointment as legal guardians allows retroactive perfection of jurisdiction, a subsequent divestment of such an appointment would allow a natural parent to successfully have the proceeding dismissed for lack of subject matter jurisdiction. Throughout the litigation, a district court's subject matter jurisdiction could fluctuate moment to moment. We embrace the federal rule here because of the statutory and policy considerations to expedite resolution of matters involving children.

We also find the time-of-filing rule to be enforced in similar matters by Kansas appellate courts. See, *e.g., Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, 99, 106 P.3d 492 (2005) ("As we have previously stated, the date of filing the petition for review is critical for determining whether the district court has subject matter jurisdiction."); *In re Marriage of Hampshire*, 261 Kan. 854, 862-64, 934 P.2d 58 (1997) (examining, for purposes of determining whether the district court had subject matter jurisdiction, the appellant husband's status at the time of filing of the petition for divorce); *In re Marriage of Takusagawa*, 38 Kan. App. 2d 401, 406-07, 166 P.3d 440, *rev. denied* 285 Kan. 1174 (2007) (stating that all property of parties to a petition for divorce comes under the jurisdiction of the divorce court and examining parties' financial status at the time of filing of the petition for divorce to establish relevant information). Therefore, the later grant to J.W.C. and J.R.C. of custody of I.H.H.-L. did not cure their lack of statutory authority to request the termination of Father's parental rights.

Although not argued at any time by these adoptive parents, their lack of legal custody does not deprive the court of jurisdiction, however, because they were "petitioners for adoption" under K.S.A. 2010 Supp. 59-2136(e). A petition for adoption may be filed under K.S.A. 59-2128 by "the person desiring to adopt the child." It may seem legally tenuous to allow a "person desiring to adopt" to invoke the jurisdiction of the court for both adoption and termination of the natural parent's rights, but this is precisely the express language of the statutory scheme. Thus, we must conclude that the adoptive parents had initial authority to seek termination of father's parental rights as petitioners for adoption, but this conclusion does not definitively determine the court's jurisdiction. We must determine whether the petition was complete, and K.S.A. 59-2128(f) clearly requires that the petition be accompanied by the filing of written consents under K.S.A. 2010 Supp. 59-2129.

*Lack of Authorized Consent to Adoption Also Imperils Jurisdiction of the Entire Proceeding*

J.W.C. and J.R.C. filed their petition for adoption on October 2, 2009. K.S.A. 59-2111 *et seq.*, otherwise known as the Kansas Adoption and Relinquishment Act, governs adoptions in Kansas. K.S.A. 59-2128 lists the requirements for a petition for adoption, and subsection (f) states that "[t]he written consents to adoption required by K.S.A. 59-2129, and amendments thereto, the background information required by K.S.A. 59-2130, and amendments thereto, the accounting required by K.S.A. 59-2121 and amendments thereto, and any affidavit required by K.S.A. 59-2126 shall be filed with the petition for adoption."

K.S.A. 2010 Supp. 59-2129(a) states:

"Consent to an independent adoption shall be given by: (1) The living parents of the child; or

"(2) one of the parents of the child, if the other's consent is found unnecessary under K.S.A. 59-2136, and amendments thereto; or

"(3) the legal guardian of the child, if both parents are dead or if their consent is found to be unnecessary under K.S.A. 59-2136 and amendments thereto; or

"(4) the court entering an order under K.S.A. 2010 Supp. 38-2270, and amendments thereto; and

·"(5) the judge of any court having jurisdiction over the child pursuant to the revised Kansas code for care of children, if parental rights have not been terminated; and

"(6) the child sought to be adopted, if over 14 years of age and of sound intellect."

Here, J.W.C. and J.R.C. believed they fell under subsection (3) of the statute, so they filed contemporaneously as temporary co-guardians of I.H.H.-L. their consent to their adoption of I.H.H.-L. As we have already concluded, the adoptive parents were not temporary co-guardians upon the filing of the adoption petition.

Research has produced only one Kansas case directly addressing the necessity of consent to adoption from a statutorily authorized person. This court addressed the issue in *In re Adoption of Smith*, 6 Kan. App. 2d 575. In *Smith*, this court stated: "A consent from some statutorily authorized person under K.S.A. 59-2102 is essential in the proper filing of a petition for adoption. Failure to comply with this requirement deprives the court of jurisdiction to hear or grant the petition." 6 Kan. App. 2d 575, Syl. The consent statute in effect at the time, K.S.A. 59-2102 (Weeks 1976), was repealed in 1990 and contained the consent language that is now in K.S.A. 2010 Supp. 59-2129. See *In re Adoption of J.H.G.*, 254 Kan. 780, 796, 869 P.2d 640 (1994) (recognizing that the requirements of K.S.A. 59-2102 were recodified as K.S.A. 1993 Supp. 59-2114, K.S.A. 1993 Supp. 59-2115, and K.S.A. 1993 Supp. 59-2129).

The *Smith* court found:

"The crucial question for decision in this case is the necessity of a consent from the mother or other statutorily authorized person as set forth in K.S.A. 59-2102(4) and (5). It is undisputed by the parties that the natural mother did not consent to this adoption, that a legal guardian had not been appointed so that such consent could be given, and that those agencies set forth in K.S.A. 59-2102(5) are not involved in this matter.

"K.S.A. 59-2101 *et seq.*, and 59-2277 *et seq.*, provide that a consent from some statutorily authorized person is essential in the proper filing of a petition for adoption. The failure to comply with this requirement deprives the court of jurisdiction to hear and grant the relief requested." 6 Kan. App. 2d at 576-77.

Likewise, in the instant case, the adoption statutes require proper consent to an adoption. See K.S.A. 59-2128(f). Here, there is no consent from any statutorily authorized person. See K.S.A.

2010 Supp. 59-2129. Therefore, the district court did not have jurisdiction over the petition for adoption and should have dismissed the case.

Further, Father points out that even if the temporary co-guardianship had been extended, J.W.C. and J.R.C. lacked the authority to consent to an adoption. This argument is also persuasive. The order appointing J.W.C. and J.R.C. temporary co-guardians specifically granted them authority pursuant to certain statutory subsections:

"4. [J.W.C. and J.R.C.], as temporary co-guardian, shall have the powers and duties set out in K.S.A. 59-3075(b)(2), (b)(3), (b)(4), (b)(5), and (b)(6), including but not limited to:

(a) Provide for the safety and well being of I.H.H.-L.;

"5. [J.W.C. and J.R.C.], as temporary co-conservator, shall have the power and duties as set out in K.S.A. 59-3078(b)(1), (b)(2), (b)(3), (b)(4), (b)(5), (b)(6), and (b)(7)."

None of these statutory subsections grant the authority for consent to adoption. Moreover, K.S.A. 2010 Supp. 59-3075(e) states that "[a] guardian shall not have the power . . . (3) to consent to the adoption of the ward, unless approved by the court." As Father notes, the trial court did not issue any order giving J.W.C. and J.R.C. the authority to consent to an adoption of I.H.H.-L.

Although adoptive parents argue that the ultimate findings of the court should be construed as sufficient to fulfill the requirement of authoritative consent, we disagree. They argue that "[i]n the memorandum decision issued by the court on July 15, 2010, the court found that the best interest of the minor child would be achieved by the adoption of her by the petitioners, so it is safe to assume that the court would have approved had the guardian consented to the adoption." Regardless of the assumptions J.W.C. and J.R.C. would like this court to make, the statute states that a guardian cannot consent to adoption without the approval of the court. See K.S.A. 2010 Supp. 59-3075(e)(3). J.W.C. and J.R.C. never had approval of the court; therefore even if they had the full legal authority of guardians under K.S.A. 2010 Supp. 59-3075, their consent to the adoption would not have been valid.

For the reasons explained above, the district court did not have jurisdiction over the adoption proceedings or the associated request to terminate father's parental rights. Therefore, the district court's orders and judgment of July 15, 2010, are void. See *Waterview Resolution Corp. v. Allen*, 274 Kan. 1016, 1024, 58 P.3d 1284 (2002) ("A judgment is void if the court that rendered it lacked subject matter jurisdiction, personal jurisdiction, or acted in a manner inconsistent with due process. [Citation omitted.]"). "A void judgment is a nullity." *In re Adoption of A.A.T.*, 287 Kan. 590, Syl. ¶ 2, 196 P.3d 1180 (2008), *cert denied* 129 S. Ct. 2013 (2009); see also *In re Marriage of Welliver*, 254 Kan. 801, 803-04, 869 P.2d 653 (1994) ("A void judgment is a nullity and may be vacated at any time.").

## WHAT EFFECT DOES OUR CONCLUSION REGARDING LACK OF JURISDICTION OVER THE ADOPTION PROCEEDINGS HAVE ON FATHER'S CLAIM TO PATERNITY?

At oral argument, both parties voiced concern that an order of vacatur for lack of jurisdiction would also vacate the district court's finding that Father is the father of I.H.H.-L., thereby leaving I.H.H.-L. without a legal guardian. Due to the procedural history of the cases on appeal, however, this is clearly not the case.

On December 31, 2009, the district court consolidated the guardianship case and the adoption case. As noted above, however, J.W.C. and J.R.C. filed two separate actions: case No. 09PR56P was a guardianship case, and case No. 09AD15G was an adoption proceeding. Although the district court's jurisdiction over the adoption proceeding was arguably questionable from the case's inception, the guardianship proceeding appears to have been jurisdictionally sound.

K.S.A. 2010 Supp. 59-3059(a)(1) governs petitions for appointment of guardian or conservator for a minor and states:

"Any person may file in the district court of the county of residence of the proposed ward or proposed conservatee or of any county wherein the proposed ward or proposed conservatee may be found, a verified petition requesting the appointment of a guardian or a conservator, or both, for a minor in need of a guardian or conservator, or both."

K.S.A. 2010 Supp. 59-3060(a)(1) governs petitions for appointment of guardian or conservator for a minor with an impairment and contains identical language concerning who may file such a petition. A district court's subject matter jurisdiction over a guardianship proceeding attaches at the commencement of the proceedings. See *In re Guardianship of Sokol*, 40 Kan. App. 2d 57, 64-67, 189 P.3d 526 (2008).

On July 23, 2009, J.W.C. and J.R.C. filed the petition for the appointment of co-guardians and co-conservators for I.H.H.-L. in the district court of Crawford County, which at the time was I.H.H.-L.'s county of residence. Therefore, the district court had subject matter jurisdiction over the guardianship proceeding. This is independent of the subject matter jurisdiction over the subsequent adoption proceeding, which commenced on October 2, 2009.

The Kansas Parentage Act, K.S.A. 38-1110 *et seq.*, governs proceedings concerning parentage of a child other than those governed by the Indian Child Welfare Act. Here, J.W.C. and J.R.C. correctly asserted in their petition for appointment of guardians and conservators that paternity had not been established. K.S.A. 38-1114(a) sets out circumstances under which a man is presumed to be the father of a child, none of which had been met at the time the guardianship petition was filed.

Thereafter, Father established his entitlement to a statutory presumption of paternity. K.S.A. 38-1114(a)(5) mandates that a man is presumed to be the father of a child if "[g]enetic test results indicate a probability of 97% or greater that the man is the father of the child." Further, K.S.A. 38-1114(b) states that "[a] presumption under this section may be rebutted only by clear and convincing evidence, by a court decree establishing paternity of the child by another man, or [if two or more statutory paternity presumptions conflict with each other, in which case an alternate test determines which presumption controls.]" Here, Father and I.H.H.-L. underwent genetic testing, the results of which determined that the probability Father was I.H.H.-L.'s father was 99.999%. These results were submitted to the district court as an attachment to

Father's "Brief on Paternity," filed November 20, 2009, before the two cases were consolidated.

It does not appear that the district court made a finding or order of paternity until its memorandum decision terminating Father's parental rights on July 15, 2010, which stated: "The identity of the natural father was determined by DNA testing to be that of [Father] at the request of the petitioners." Legally, however, the presumption arose as soon as Father filed the genetic testing results with the district court, and J.W.C. and J.R.C. did not subsequently attempt to rebut the presumption. Although they noted that no order establishing paternity had been issued, J.W.C. and J.R.C. stated in a memorandum filed with the court on November 30, 2009, in the guardianship proceeding that "[p]ursuant to K.S.A. Chapter 38-1114 no presumption of paternity existed until the genetic test results were received."

At that point in the guardianship proceedings when the genetic testing results were received and established a probability of paternity higher than that required by statute, father was entitled to a presumption under Kansas law that he was the natural father of I.H.H.-L. under K.S.A. 38-1114(a)(5). Our conclusions regarding the jurisdictional defects in the adoption proceedings do not impact this aspect of the consolidated proceeding.

SUMMARY AND CONCLUSION

The adoption petition filed by adoptive parents was fundamentally defective because at the time of its filing, adoptive parents had no legal authority to consent to the adoption. The district court proceedings initiated by the adoptive parents seeking termination of Father's parental rights and adoption of the child are therefore void for lack of jurisdiction, and the orders and judgments entered therein are hereby vacated. This vacatur does not impact the legal presumption of Father's paternity because it was established in the guardianship proceedings, which are jurisdictionally sound. Thus, the unfortunate suicide of the mother, the vacatur of the judgment in the adoption case, and the presumption of paternity entitles natural father to have his rights to his infant daughter, I.H.H.-L., fully restored. See *In re Adoption of Baby Girl P.*, 291 Kan. 424,

433-37, 242 P.3d 1168 (2010) (discussing parental preference and restoring custodial relationship between natural father and his daughter).

We recognize that this has been a long, contentious, and emotional battle to determine the destiny of I.H.H.-L. We share the district court's concerns over Father's apparent minimal financial support of the child, allegations of relative instability, and his reputation—if not proof—of some history of domestic turbulence. Nevertheless, we cannot overlook the requirements that our legislature has established for proceedings of this nature. Those requirements are based upon the historical sanctity under Kansas law for the preference to maintain or restore children to their natural parents absent clear authority to the contrary. A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of his or her child. Before a parent can be deprived of his or her right to the custody, care, and control of the child, he or she is entitled to the due process of law. *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007); see also *In re Adoption of B.M.W.*, 268 Kan. 871, 881, 2 P.3d 159 (2000) (the right to be the legal parent of a child is a fundamental right, which cannot be abrogated except for compelling reasons).

We remand to the district court with directions to vacate the judgment terminating Father's parental rights, to vacate all orders regarding adoption of the child, and to dismiss the adoption proceeding. The guardianship proceeding remains intact from a jurisdictional perspective and provides the court with adequate jurisdiction to oversee the orderly restoration of the child to the natural father. We adopt our Supreme Court's recent mandate in a case with similar aspects.

"In remanding this matter, this court brings to the attention of the district court the potential traumatic impact of sudden, precipitous separation of a child from the only parents she has ever known. This is one of the fortunately rare instances where one fervently wishes that the blindness of justice had at its disposal a judicial seeing-eye dog to guide it around a required outcome which may cause harm to a child. In recognition of the unavoidable repercussions of this order, this court urges the district court to create a process, occurring over a period of time not to exceed 30 days, for a custodial transition to occur. In addition to considering the

duration of any such transitional process, the district court may in its discretion also consider including the participation of appropriate professional personnel." *In re Adoption of Baby Girl P.*, 291 Kan. at 437.

Vacated and remanded with directions.